**NATIONWIDE MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**H. C. FLEMING, Jr., et al., Defendants.**

**Civ. A. No. 8777.**

United States District Court
D. South Carolina,
Charleston Division.

Aug. 17, 1966.

Joseph H. McGee, Jr., Moore, Mouzon & McGee, Charleston, S. C., for plaintiff.

J. C. Hare, of Legare & Hare, and Robert A. Patterson, of Barnwell, Whaley, Stevenson & Patterson, Charleston, S. C., for various defendants Fleming and one unnamed, insurance carrier and uninsured motorist.

Burnet R. Maybank, of Maybank & Manucy, Charleston, S. C., for various defendants White.

HEMPHILL, District Judge.

Plaintiff seeks definition of its responsibility to indemnify amounts recovered in South Carolina courts arising out of an automobile collision involving defendants. The salient facts are set forth in pre-trial stipulations. Plaintiff assumed defense of the South Carolina court claims against defendant H. C. Fleming, Jr., under a non-waiver agreement.

The defendant, Henry C. Fleming, Jr., was a resident of Sumter, South Carolina, until in October, 1962, when he moved to Mt. Pleasant, in Charleston County, and there began the operation of a television business. Along with this business, Fleming had acquired a 1953 Ford Truck which he subsequently traded to Paul Motor Company of Charleston toward the purchase of a 1962 Ford ½-Ton Panel Van, serial no. E145H304755. Nationwide Mutual Insurance Company thereupon issued to Fleming a policy of liability insurance #61–810–360 dated October 16, 1963 covering for a period of twelve months said 1962 Ford Van. The premium for this policy was duly paid.

The 1962 Ford Van was used primarily in the television repair business but Fleming from time to time used it as a personal vehicle. He was also the owner of another automobile, a 1954 Pontiac which he had acquired sometime in 1961. This latter automobile was insured by Nationwide Mutual Insurance Company, but the policy was allowed to expire before the policy on the Ford Van was written on October 16, 1963. At that time the 1954 Pontiac was not in running condition and was not insured and not licensed for 1963–64.

On March 16, 1964, Fleming purchased from Ray Waits Motor Company of Charleston, South Carolina, a 1960 Pontiac 2-Door Hardtop Passenger automobile, serial no. 60B20489, paying part of the purchase price by trading in the 1954 Pontiac above referred to. At the time he purchased the 1960 Pontiac on March 16, 1964, Fleming was making efforts to sell his television repair business, including the 1962 Ford Van. He had talked with one or more prospective purchasers but without any result. He bought the 1960 Pontiac with the idea that he would need a car for his own use if and when

he disposed of his business and the 1962 Ford Van. In the meantime, however, he continued to carry on the business and to use the Ford Van while attempting to sell the business.

When he purchased the 1960 Pontiac on March 16, Fleming filled out and sent to the South Carolina Highway Department a required certificate commonly known as Form #402 bearing that date certifying that the 1960 Pontiac was covered by Nationwide Mutual Insurance Company under Policy No. 61–810–860, the effective date being October 16, 1963. The Highway Department's stamp on this Form #402 says "Forwarded Company for Verification May 14, 1964. Insurance Motorist Section." This stamp indicated that a photostatic copy of this Form #402 was on that date mailed to Nationwide Mutual Insurance Company at its office in Raleigh, North Carolina. Nationwide Mutual Insurance Company has no record of receiving this photostatic copy but is not prepared to say positively that it was not received. The Highway Department records show, however, that no acknowledgment of the receipt of this photostat or any other communication with reference to it was received by the Highway Department from Nationwide Mutual Insurance Company.

Some time in the first half of April, 1964, probably near April 15th, Fleming began negotiations with one W. T. Wilkins for the sale to him of the television business including the Ford Van. On April 25, the Parties reached an agreement by which Wilkins took over the operation of the business. Wilkins agreed to pay the purchase price in several installments and to take care of two past due installments on a mortgage to Home Finance Company covering the 1962 Ford Van. Fleming gave the keys of the Ford Van to Wilkins, but retained the legal title and made no transfer of title to Wilkins because he wished first to be sure that Wilkins would carry out his agreement as to payment. Henceforth, however, Wilkins had entire custody and use of the Ford Van.

Thereafter, Wilkins informed Home Finance Company of his arrangement with Fleming and offered to take up the past due installments. He was told that Home Finance preferred to repossess the Ford Van and then transfer it to him upon his payment of the past due installments. The Van was repossessed and Fleming on some date in May executed a release and surrender of title to Home Finance Company. Wilkins then paid the past due installments and on or about June 23, 1964, Home Finance Company, at his direction, transferred the title to the Ford Van to Mrs. W. D. Wilkins. Wilkins requested that State Farm Mutual Insurance Company transfer to the Ford Van the coverage of a policy which had been issued on a 1952 Oldsmobile owned by him and a new policy was on June 24, 1964 issued by that company on the Ford Van with Mrs. Wilkins named as owner.

Wilkins completed payment to Fleming of the full purchase price of the television repair business, on or about August 3, 1964. On August 5, 1964, the South Carolina Highway Department issued a registration card for the 1962 Ford Van in the name of Mrs. W. D. Wilkins. On the afternoon of August 30, Fleming was driving the 1960 Pontiac purchased by him from Ray Waits Motor Company as hereinabove stated on U. S. Highway 17 in the town of Mt. Pleasant, South Carolina, and collided with an automobile driven by Zed L. White as a result of which collision Mrs. H. C. Fleming, Jr., who was riding with her husband and Zed L. White and his infant son Francis White were killed and other occupants of the White automobile were injured and the White automobile was damaged. Actions have been commenced and are now pending in the Court of Common Pleas for Charleston County against Fleming on the behalf of the Estate of Zed L. White and several of the White children who were in the automobile.

Fleming maintains that Nationwide Mutual Insurance Company is obligated to defend all such actions against him under the provisions of policy #61–810–

360 issued upon the 1962 Ford Van as hereinabove stated and to pay any judgments rendered in such action, and Nationwide is defending the said pending cases under a reservation of rights maintaining that the said policy afforded no coverage of the 1960 Pontiac automobile driven by Fleming in the collision aforesaid.

Said Policy #61–810–360 contains among others the following provisions which Fleming maintains extend the coverage of the policy to the 1960 Pontiac automobile driven by him in the said collision:

"(a) *Automobile.* Except with respect to insurance under division 2 of coverage, (having to do with medical payments) and except where stated to the contrary, the word 'automobile' means: * *. 4. *Newly Acquired Automobile* —An automobile, ownership of which is acquired by the named insured or his spouse, if resident of the same household, if (i) it replaces an automobile owned by either and covered by this policy, or the company insures all automobiles owned by the named insured and such spouse on the date of its delivery, and (ii) the named insured or such spouse notifies the company within 30 days following such delivery date; but such notice is not required under coverages E, F, and division 1 of coverage G (having to do with property damage and personal injury liability and medical payments) if the newly acquired automobile replaces an owned automobile covered by this policy * * *."

Prior to the collision, Fleming had not given to Nationwide Mutual Insurance Company nor had Nationwide received any notice of his acquisition of the 1960 Pontiac involved in the collision or of his disposal of the Ford Van covered by Policy No. 61–810–860 except such notice as may have been afforded by his filing a Form #402 with the South Carolina Highway Department as aforesaid.

Because of the severe injuries received by Fleming in the collision with the White automobile, it was impossible for Nationwide to communicate with him for sometime thereafter. After his release from the hospital in Charleston, Fleming went to his father's home in Manning where a representative of Nationwide called on him and informed him that there was a question of coverage and requested him to sign a non-waiver Agreement with regard to the several suits arising out of the collision. Fleming stated that he was represented by counsel and could not sign a non-waiver without his advice. By letter dated November 18, 1964, Nationwide notified Fleming's attorney, Mr. J. C. Hare, that it was denying coverage. Thereafter, Fleming did sign a non-waiver agreement.

Nationwide policy #61–810–860 expired on October 16, 1964 and was automatically renewed but it was cancelled on November 2 for nonpayment of premium. Thereafter, Nationwide mailed a letter dated January 22, 1965 addressed to H. C. Fleming, Jr., at P. O. Box 163, Mt. Pleasant, South Carolina, which was the address given in the insurance policy. This letter stated that Nationwide had recently learned that the vehicle covered by policy #61–810–360 had been transferred on April 25, 1964 and that the company was therefore tendering notice of cancellation effective April 26, 1964. This letter stated that the refund check for $17.90 was being mailed. The envelope containing this check was returned to Nationwide with "Moved—Left No Address" endorsed on the envelope. Subsequently, Nationwide addressed a letter dated February 5, 1965 to Fleming in care of H. C. Fleming, Sr., Manning, South Carolina, reading: "Our records reveal that your policy #61–810–360 cancelled due to nonpayment of renewal on November 2, 1964. However, we have recently learned that you relinquished ownership of the vehicle insured by this policy on April 25, 1964. Therefore, we

are tendering notice of cancellation effective 12:01 A.M., April 26, 1964.

"The attached check of $17.90 is the un-earned portion of your premium payment."

By letter dated February 12, 1965, Messrs. Legare & Hare as attorneys for Fleming wrote Nationwide as follows:

"We represent Mr. H. C. Fleming, Jr. whose present address is in care of his father, H. C. Fleming, Sr., Manning, South Carolina. Mr. Fleming has referred to us your letter to him dated February 5, 1965 in which you attempted to cancel his policy #61–810–360 with your company as of a retroactive date, together with your check dated January 19, 1965 made payable to him in the sum of $17.90 as a refund of un-earned premium.

"We are returning herewith the above-mentioned check as it is the position of our client, Mr. H. C. Fleming, Jr., that the above policy was in effect at the time of the collision in which he was involved on August 30, 1964 and that same was not cancelled as of that date and that Mr. Fleming only saw fit not to renew same when it expired."

In order to be covered the newly acquired 1960 Pontiac automobile must be either a replacement automobile, or an additional car where Nationwide insures all other cars owned by the insured. In the latter instance notice must be given to the insurer within thirty days of the delivery of the car.

Was the 1960 Pontiac covered by Nationwide at the time? Fleming maintains that the 1960 Pontiac replaces the Ford Van and therefore is insured under the Nationwide policy issued originally on the Ford Van. Other than the filing of a South Carolina Highway Department Form 402, which defendants submit constituted notice, there was no notice to Nationwide that the 1960 Pontiac was acquired prior to the accident.

The Company asks that it be declared that the 1960 Pontiac was not covered. The problem is not whether the 1960 Pontiac was a replacement for the 1954 (old) Pontiac, but whether the 1960 Pontiac was in fact a "replacement" automobile for the Ford Van as contemplated by the contract. The major difficulty in the resolution of the problem is the retention of the Ford Van for over one month after delivery of the replacement vehicle.

At 7 Am.Jur.2d Automobile Insurance § 101 (1963) it is stated generally that:

It has been held that the replacement car must replace the car described in the policy, which must be disposed of or be incapable of further service at the time of replacement. However, temporary retention of possession of the vehicle described in the policy has been held not to prevent the extension of coverage to the newly acquired automobile where ownership of the vehicle alleged to have been replaced ceased prior to the accident. (footnotes omitted.)

In Mitcham v. Travelers Indem. Co., 127 F.2d 27 (4th Cir. 1941), the Fourth Circuit held that the described vehicle was not disposed of where title was retained after delivery of the replacement vehicle. The owner in that case insured a Buick with the company. Thereafter he purchased a Lincoln-Zephyr, paying over a Ford, which he got from his mother and which was insured by another company, and giving a chattel mortgage. He had the Lincoln–Zephyr insured for fire, theft, and collision by a company other than Travelers and he submitted that he intended that liability coverage of the Lincoln-Zephyr would be effected by automatic transfer from the Travelers policy on the Buick. The Buick was put up for sale with a motor company the same day with the request that the motor company insure the Buick against fire and theft. The Buick was not sold, however, and title and ownership remained in the owner. On these facts the court held no replacement had taken place.[1]

1. There was also failure to comply with a notice provision which was contained in the policy in dispute.

*Mitcham* distinguished Merchants Mut. Cas. Co. v. Lambert, 90 N.H. 507, 11 A.2d 361, 127 A.L.R. 483 (1940), infra, in that the described automobile that was replaced and retained in *Lambert* was garaged and actually inoperable and incapable of further service at the time of replacement.

In Yenowine v. State Farm Mut. Auto. Ins. Co., 342 F.2d 957 (6th Cir. 1965) the Sixth Circuit held with what it considered a rule of general accord that the described car must be disposed of or incapable of further service at the time of replacement. The authorities cited there were State Farm Auto. Ins. Co. v. Shaffer, 250 N.C. 45, 108 S.E. 2d 49 (1959); Mitcham v. Travelers Indem. Co., supra; and Lynam v. Employers' Liability Assur. Corp., 218 F. Supp. 383 (D.C.Del.1963). The facts in *Yenowine* were essentially as follows: The owner had a 1953 Plymouth which was insured by State Farm. In 1960 she purchased a 1955 Plymouth and retained the old one. The 1955 Plymouth did not give satisfactory service and she traded it for a 1956 Plymouth. There was evidence that the 1953 Plymouth which was retained was in some use by her family up to February of 1961. The 1956 Plymouth was involved in an accident in June of 1961. Refraining from answering any questions posed by a "replacement" on a "replacement" the court found that neither car replaced the retained one. No appeal was taken from the law as charged at the trial of the case. The 1953 Plymouth was found on the facts to be 1. serviceable and 2. not disposed of. The court noted here, as in *Mitcham* that to hold otherwise would result in the situation where the owner could assert coverage on the replacement and the retained car, committing the insurer to two cars contrary to their intention and contrary to the purposes of the policy provision.

In an Annotation at 34 A.L.R.2d 936, 945 § 9 there is stated the proposition that "the fact that the car described in the policy was retained by the insured and was in a legally usable condition has been held not to preclude transfer of coverage to a newly acquired car, where such car was actually purchased to replace the first car for the same use." Merchants Mut. Cas. Co. v. Lambert, supra, is cited for the authority for that statement, however, the facts of the case demonstrate how narrowly the words "legally useable" must be understood. In that case a 1935 Pierce Arrow was purchased and a 1930 Pierce Arrow which was described in a policy was retained. The older model was garaged, unfit for further service, but because it still had valid license plates it was considered *legally* operable on the highways. This consideration was held immaterial to the issue of actual serviceability. The court found a replacement had occurred. The court further said that in construing the provision of the policy "the test is not what the insurer intended its words to mean but what a reasonable person in the position of the insured would have understood them to mean." 11 A.2d 361, 362, 127 A.L.R. 483, 485.

In the *Lambert* case it was reasonable for the insured to believe that his 1935 Pierce Arrow replaced his old one which he ceased to operate. Is it reasonable for an insured to assume that he can transfer coverage from his all purpose truck to a saloon car and retain and operate the truck for another four weeks or so? The court does not think so and the cases do not indicate that the contract can be stretched so far.

In Nationwide Mut. Ins. Co. v. Mast 2 Storey 127, 52 Del. 127, 153 A.2d 893 (Superior Ct. 1959), the described vehicle was retained temporarily and the court there said that "although the point is not clearly established, I conclude that temporary retention of possession of the vehicle described in the policy does not, ipso facto, prevent the extension of coverage to the newly acquired automobile as a replacement within the meaning of the policy." 153 A.2d at 896. The case reported was a ruling on motion for summary judgment by the trial judge of the Superior Court. The unique factual situation shows that the rule was not so extended as to cover the facts in the in-

stant case. The insured there had a policy covering a 1955 Ford Stake Body Truck issued June 18, 1957. He purchased a 1946 Kentucky flat bed trailer on July 24, 1957 and removed the stake body from the Ford and pulled the trailer with the Ford. In September he purchased a 1945 GMC tractor to replace the Ford and improve the performance of his unit. All of these components were retained until October 20, 1957 when he delivered the Ford to a motor company for repossession under a conditional sales contract. Under these circumstances the court found a replacement and, admitting the question was not clearly established, cited Merchants Mut. Cas. Co. v. Lambert, supra, as authority.

Because of the facts in *Mast* and the procedural situation this court neither accepts nor rejects the holding in the case. It is readily distinguishable in many aspects and is not deemed controlling here. There is no unique metamorphosis here as in *Mast*. The truck belonging to Fleming was both serviceable and undisposed of at the time of delivery of the alleged replacement, and, therefore, no transfer of coverage was accomplished under the policy as a "replacement."

 The Pontiac was newly acquired, of course, and if the provisions of the policy relating to automatic insurance of additional vehicles are complied with then coverage would still be afforded. Under this provision of the policy all other cars

of the insured must be insured by the company and notice of the newly acquired vehicle must be given within thirty days of the delivery of the new vehicle. The contention of the defendants is that the notice provision was complied with. On March 16, 1964 when Fleming acquired the 1960 Pontiac he filed a Form 402 with the South Carolina Highway Department noting that the car was insured by Nationwide. This he was required to do in any event, and nothing more was done. The Highway Department records indicate that the Form 402 was sent to Nationwide on May 14, 1964. The lapse of time between the filing of the form and the forwarding of the information to the insurer demonstrates that in no fashion could this be the type of notice that is contemplated by the contract of insurance.[2] The administrative plans and operations of the State Highway Department cannot be held to fault the insurer or the insured. The matter at its simplest is that filling out a required form for the highway department does not equate with informing the insurer they are committed to provide additional protection.

In Miller v. Stuyvesant Ins. Co. of New York, 242 S.C. 322, 130 S.E. 913 (1963), the South Carolina Supreme Court held in accord with the rule as stated in the Annotation at 34 A.L.R.2d 943 [3], the court adopting the language:

It is well established that where the 'automatic insurance' clause requires

2. Note that in Miller v. Stuyvesant Ins. Co. of New York, 242 S.C. 322, 130 S.E. 2d 913 (1963), a copy of the Form 402 was offered into evidence during argument. It was not admitted; exceptions were not taken from the ruling. The Court considered the point on appeal with consent of counsel and found the evidence was properly excluded as untimely and improper.

3. In the annotation at 34 A.L.R.2d 936 (1954) the cases are divided into those where the accident occurs during the notice period and those where the accident occurs after the notice period. In the instance where the accident occurs during the notice period the courts have found that coverage was afforded by automatic

transfer during the notice period. On the other hand, in the latter instance the courts have held that failure to comply with the notice requirement precluded coverage. Annot. 34 A.L.R.2d 936, 943–45 § 7 (1954); Western Cas. & Sur. Co. v. Lund, 234 F.2d 916 (10th Cir. 1956). See Inland Mut. Ins. Co. v. Stallings, 263 F.2d 852 (4th Cir. 1959); Hoffman v. Illinois Nat. Cas. Co., 159 F.2d 564 (7th Cir. 1947).

In 1954 when the annotation was published there was no case involving the factual situation where notice was given after the expiration of the notice period but before the accident. 34 A.L.R.2d 936, 943 § 7 n. 6. Cases cited in the Later Case Service, 4 A.L.R.2d Later Case

notice of the acquisition of a new automobile to be given the insurer within a specified time after delivery, the period being generally either ten or thirty days, a failure to give notice prior to an accident occurring after the expiration of the designated period precludes coverage of the new automobile. 34 A.L.R.2d 943: See also citations under this annotation and 1962 Supplement Service, A.L.R.2d, Vol. 3 page 787.

Having determined that the automobile involved in the wreck was neither a replacement nor an additional [4] automobile and not covered by the policy, it becomes unnecessary to consider the attempted retroactive cancellation of the policy.

At the hearings previously held this court did not have before it the facts of Lumbermens Mutual Casualty Co. v. Quick, 257 F.Supp. 252 (D.C.S.C. decided August 6, 1966). Therefore this court will not here question the failure of plaintiff to exhaust procedures available in the South Carolina courts as contained in Section 10–2002 South Carolina Code, as amended, and related statutes (on declaratory judgments).

■ Contrary to defendant's theory of estoppel the court does not under these facts find the necessary requisites for estoppel.

For the foregoing reasons the court finds that the 1960 Pontiac was not insured by Nationwide, and that Nationwide is not obligated to defend Fleming in actions arising out of the collision involving the 1960 Pontiac.

Let the Clerk enter judgment accordingly.

And it is so ordered.

---

Service 211 (1965), for the annotation, 34 A.L.R.2d 936 (1954), still do not reach such a situation. Assuming arguendo that notice could technically be given by and through the South Carolina Highway Department the situation would be present where notice would be had before the accident. Even this situation would seem to fall within the general statement that failure to comply with the terms of the contract would preclude coverage. The contract provides in effect that thirty days protection will be afforded without notice provided it is an additional automobile. The contract provides no more and therefore after the expiration of the thirty days any action would be outside the scope of the contract. This is wholly apart from the situation where insurers will make a new contract on application providing coverage as of the postmark date of the application.

4. It is important to note that apart from the question of notice Fleming's policy on the Ford Truck was specifically endorsed for commercial use only: the Pontiac, of course, was to be used as a personal vehicle.