The COLONIAL PENN INSURANCE COMPANY

v.

Dorothy GUZOREK, Donald Guzorek, Marianne Van Winkle, Marshal Pocius and John Pocius, Appellees (Defendants below).

and

Illinois Farmers Insurance Company, Appellee (Intervenor below).

No. 45S03–9705–CV–318.

Supreme Court of Indiana.

Dec. 17, 1997.

Terence M. Austgen, Elizabeth M. Bezak, Munster, for Appellant.

James R. Bielefeld, Crown Point, for Appellees Dorothy and Donald Guzorek.

Greg A. Bouwer, Kristin A. Mulholland, Merrillville, for Appellee/Intervenor.

## ON PETITION TO TRANSFER

BOEHM, Justice.

This case presents coverage issues under an automobile liability insurance policy. We hold that the recently acquired vehicle involved in the accident that gave rise to this multiparty litigation was not covered as an "additional" car under the policy because of failure to comply with the policy's requirement of notice of the new car to the insurer. Nor is the new car a "replacement" under another policy provision. We also hold that there is no coverage of a driver whose existence and materially bad driving record were concealed from the insurer at the time of issuance.

### Factual and Procedural History

In April 1990, Dorothy Guzorek obtained an automobile insurance policy with the Colonial Penn Insurance Company ("Colonial Penn"). On a "rate request rush form," when asked to list all licensed drivers in the household, she listed only her name even though she lived with her husband Donald Guzorek. Dorothy had no tickets or violations, but Donald at that time had a suspended license due to at least two prior convictions for driving under the influence. After receiving the rate request form, Colonial Penn sent Dorothy a "personalized quotation/enrollment form" listing a variety of coverages and rates for several cars Dorothy owned. On the form, Dorothy was asked to list all "customary operators" of her cars. She wrote only her name even though she knew that Donald drove without a license several times per week to his job. Dorothy returned the form and a premium payment to initiate coverage on a Pontiac Firebird and a Chrysler LeBaron. Although Dorothy was the only named insured, the policy provided in its preprinted provision that the policyholder's spouse was "also deemed to be a policyholder."

Colonial Penn renewed the policy in April 1991 and again in 1992. In May 1992, Dorothy terminated coverage on the Firebird and substituted a Buick Skylark. On September 22, 1992, Dorothy purchased a Buick LeSabre. The policy called for notice and payment of premium for any additional or replacement car. No notice or premium for the LeSabre was ever sent. Donald continued to drive regularly and on October 20, 1992, Donald, while driving the LeSabre, had an accidental collision in Merrillville. Two other vehicles were involved, one driven by Marianne Van Winkle and the other by Marsha Pocius. Dorothy did not notify Colonial Penn of the accident because she did not believe that either Donald or the LeSabre was covered under the policy. Dorothy later stated that she had intended to terminate coverage on the Skylark and substitute the LeSabre when her policy came up for renewal on October 27, 1992, but she never did this. In January 1993, Van Winkle sued Donald and her own insurer, Illinois Farmers Insurance Group ("Illinois Farmers"), with whom she had uninsured motorist coverage. Colonial Penn first learned of the accident six months later when Van Winkle submitted a claim under Dorothy's policy. Finally, in January 1994, Marsha Pocius and her husband, John Pocius, sued both Dorothy and

Donald. Marsha Pocius also carried uninsured motorist coverage with Illinois Farmers. Colonial Penn did not learn of the Pocius lawsuit until after a default judgment was entered against the Guzoreks in 1994, which was later set aside by agreement of the parties. Colonial Penn canceled Dorothy's policy in 1994 and tendered all premiums to the trial court.

On April 7, 1994, Colonial Penn filed the present lawsuit for declaratory judgment against the Guzoreks, the Pociuses, and Van Winkle. Illinois Farmers was subsequently allowed to intervene. Colonial Penn and the Guzoreks filed cross-motions for summary judgment on the question of coverage under Dorothy's liability policy with Colonial Penn. The trial court granted the Guzoreks' motion and denied Colonial Penn's motion, ruling that (1) the LeSabre was covered as an "additional" car under the policy; (2) Donald was covered by virtue of the spousal coverage provision; and (3) Colonial Penn had not been prejudiced by the nine-month delay in learning of the accident. Colonial Penn appealed. With one judge dissenting, the Court of Appeals affirmed the trial court on the first two issues, but held that a genuine dispute of material fact precluded summary judgment on the prejudice issue. *Colonial Penn Ins. Co. v. Guzorek*, 669 N.E.2d 1042 (Ind.Ct.App.1996).

We granted transfer, 683 N.E.2d 592 (Ind. 1997) (table), and now reverse. For the reasons explained below, we conclude that Colonial Penn's motion for summary judgment must be granted and the Guzoreks' motion denied.

### Standard of Review

Summary judgment is appropriate where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Ind.Trial Rule 56(C). Although the nonmoving party has the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the nonmovant was not improperly denied its day in court. *Mullin v. Municipal City of South Bend*, 639 N.E.2d 278, 280–81 (Ind.1994). On summary judgment all facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Wright v. Carter*, 622 N.E.2d 170, 171 (Ind.1993). Contracts of insurance are governed by the same rules of construction as other contracts. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985); *Shedd v. Automobile Ins. Co.*, 208 Ind. 621, 628, 196 N.E. 227, 230 (1935) (holding same for automobile liability insurance policy). Accordingly, the proper interpretation of an insurance policy, even if it is ambiguous, generally presents a question of law that is appropriate for summary judgment. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind.1992). Although ambiguities are construed in favor of the insured, clear and unambiguous policy language must be given its ordinary meaning. *Eli Lilly*, 482 N.E.2d at 470. Failure to define a term in an insurance policy does not necessarily make it ambiguous. *Stevenson v. Hamilton Mut. Ins. Co.*, 672 N.E.2d 467, 471 (Ind.Ct. App.1996), *trans. denied.* Rather, an ambiguity exists where the provision is susceptible to more than one reasonable interpretation. *Eli Lilly*, 482 N.E.2d at 470.

### I. Was the LeSabre Covered as an "Additional" or "Replacement" Car?

The Guzoreks must prove two things to establish coverage under the Colonial Penn policy: (1) a covered car (the LeSabre); and (2) a covered driver (Donald).[1] Colonial Penn contends neither exists. Because we agree, summary judgment for Colonial Penn

---

1. The LeSabre under the policy language could have been classified as a "listed" auto, a "non-owned" auto, or neither. A listed car is one explicitly covered in the Declarations Page and a non-owned auto is, among other things, a car not available to the insured for regular use. The policy provided that "any person actually using a listed auto is protected" if the car was being used with the owner's permission and for the purpose the owner intended. Similarly, any "policyholder" was covered while driving a non-owned auto so long as the car was used with the owner's permission and for the purpose the owner intended. In these terms, for the reasons set forth in the opinion, the LeSabre was neither a "listed car" nor a "non-owned" car and Donald was not a "policyholder."

is appropriate. We first address whether the car was covered.

### A. The "additional" car provision

Resolution of this issue turns primarily on interpretation of the "automatic coverage" clause in Dorothy Guzorek's policy:

*You* may get an additional *private passenger auto* or *utility truck* during the policy period. If *We* insure all your *private passenger autos* and *utility trucks* at the time *You* get the additional auto or truck, *We'll* automatically consider it to be listed on your Declarations Page. It will have the same coverages as your other *autos*. For the coverages to apply, however, *You* must notify us within 30 days after getting the vehicle or within the policy period and pay an additional premium from the date *You* got it. *We'll* adjust your premium as described below, under "Premium Adjustment." (Italics in original.)

The accident that gave rise to this lawsuit occurred twenty-nine days after Dorothy acquired the LeSabre. Colonial Penn argues that the LeSabre was not covered as an "additional" car at the time of the accident because Dorothy failed to notify the company within thirty days that the car had been acquired. The Guzoreks and Illinois Farmers respond that coverage during the first thirty days was automatic irrespective of any

duty to notify Colonial Penn and, accordingly, the LeSabre was covered. The record does not disclose whether "all" of Dorothy's cars were insured by Colonial Penn, as this provision required, when she acquired the LeSabre on September 22, 1992.[2] In any event, assuming this prerequisite was met, the LeSabre was not covered as an additional car under the policy.

"Automatic coverage" provisions for additional vehicles are typical in automobile insurance policies. They benefit the insured and other drivers by guaranteeing a source of compensation if a recently acquired vehicle is involved in an accident. In holding that the LeSabre was covered here as an additional vehicle, the Court of Appeals majority observed that other jurisdictions have split over whether notice to the insurer is required to trigger retroactive application of an automatic coverage clause during the grace period (here thirty days). This appears to be an unaddressed question in Indiana.[3] Some courts have referred to a "general rule" that coverage is automatic during the grace period and that notice is required only to extend coverage beyond the grace period. This is also sometimes described as the majority rule. Under this view, courts have found coverage of the additional car during the grace period irrespective of whether the insured notified the insurer of the acquisition during the grace period. *See generally*

---

**2.** As noted above, in May 1992 Dorothy terminated coverage on a Pontiac Firebird and substituted a Buick Skylark. The fate of the Firebird after May is unclear. In her deposition, Dorothy stated that as of the date of the accident—October 20, 1992—she owned the Skylark, the LeSabre, and a Chrysler LeBaron. Thus, at some point between the May replacement and October 20 the Firebird was sold or discarded. The policy appears to provide that the LeSabre would have been eligible for coverage as an "additional" car only if Dorothy no longer owned the Firebird as of September 22, 1992, the day she acquired the LeSabre.

**3.** Colonial Penn and Illinois Farmers debate the relevance of *State Sec. Ins. Co. v. Ottinger*, 487 N.E.2d 446 (Ind.Ct.App.1985) and *Stockberger v. Meridian Mut. Ins. Co.*, 182 Ind.App. 566, 395 N.E.2d 1272 (1979) to the notice issue presented here. *Ottinger* is not on point because there was no dispute in that case that coverage for the first thirty days was automatic without any notice requirement under the language of that policy.

Rather, the issue was whether the accident had occurred within thirty days of the replacement, so as to guarantee coverage irrespective of the insured's failure to give notice. This turned on what was meant by a "change" of vehicles (a term not defined in the policy). The Court of Appeals construed "change" to mean when the new car was licensed and operational (twenty-nine days before the accident) and not when it was acquired (forty days before the accident). *Stockberger* is also not helpful. That decision involved an automatic coverage clause that required notice within thirty days of the acquisition to cover an additional or replacement vehicle. Because the accident in that case occurred long after the thirty days had expired and no notice had been given, there was no coverage. *Stockberger* therefore stands for an unremarkable proposition not implicated under these facts— that failure to give notice during the grace period, when notice is required, results in no coverage *after* the grace period. In sum, today's case is adjudicated against the backdrop of no directly relevant precedent.

James L. Isham, Annotation, *Construction and Application of "Automatic Insurance" or "Newly Acquired Vehicle" Clause ("Replacement," and "Blanket," or "Fleet" Provisions) Contained in Automobile Liability Policy*, 39 A.L.R.4th 229, at §§ 23–24 (1985 & Supp.1997). Coverage for an accident occurring during the grace period has been found even where the policy described notification as a "condition precedent" to retroactive application of the automatic coverage clause. *Republic Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 527 F.2d 1002 (4th Cir.1975).

However, examination of these cases finds less than meets the eye. Some, including *Hoffman v. Illinois Nat'l Cas. Co.*, 159 F.2d 564 (7th Cir.1947) (applying Indiana law but citing no Indiana authority), are unclear as to whether notice of a potential claim for the accident (and therefore notice of the new car) was given within the grace period. Others found the policy ambiguous as to whether coverage during the grace period was automatic but notice was required to extend it. *See Farm & City Ins. Co. v. Anderson*, 509 N.W.2d 487 (Iowa 1993) (tracing evolution of majority view and discussing cases from other jurisdictions). Indeed, *Anderson* may be part of a growing minority challenging application of the majority rule to an unambiguous policy clearly requiring notice as a condition to effect coverage. *See also Guerra v. Sentry Ins.* 927 S.W.2d 733 (Tex.App.1996), *reh'g overruled, writ denied; Auto–Owners Ins. Co. v. Winter*, 188 Mich.App. 230, 469 N.W.2d 314 (1991).

We agree with the Supreme Court of Iowa that in the case of an unambiguous policy requiring notice to trigger "automatic" coverage of additional cars, that provision is enforceable and can be invoked to deny coverage if notice is not given. Although coverage of an additional car retroactive to the date of acquisition is a laudable goal, this objective cannot be carried to the extent that the policy itself is disregarded. In construing an insurance contract, we ultimately must give effect to the intent and reasonable expectations of the parties as expressed in the contract. *See, e.g., Marshall v. Universal Underwriters Ins. Co.*, 673 N.E.2d 513, 517 (Ind.Ct.App.1996), *trans. denied.* Here the policy stated that an additional car would be covered retroactive to the date of acquisition if Dorothy notified Colonial Penn within thirty days or the end of the policy period, and paid an adjusted premium. She did neither. To hold that the LeSabre was covered during the grace period irrespective of these omissions would effectively read Dorothy's duties out of the policy, in contravention of what the policy plainly provided. Because an additional premium is often due for a new vehicle, finding coverage would give her insurance for which she has not paid. It is well settled that the power to interpret contracts does not extend to changing their terms. *See, e.g., Firemen's Ins. Co. v. Temple Laundry Co.*, 195 Ind. 194, 198, 144 N.E. 838, 839 (1924) ("[W]here the contract is plain and its meaning clear, the court will not change its evident meaning, by rules of construction, and thereby make a new contract for the parties."). And as federal courts predicting Indiana law in diversity cases have observed, insurance policies in this state will not be given an unreasonable construction to provide added coverage. *Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1157 (7th Cir.1993).

Contracts of insurance are often not the product of an equal bargaining relationship:

> The insurer not only fully knows the contents of the writing, but also adequately comprehends its legal effect. The insured has no voice in fixing or framing the terms of [the] policy, but must accept it as prepared and tendered, usually without any knowledge of its contents, and often without ability to comprehend the legal significance of its provisions.

*Glens Falls Ins. Co. v. Michael*, 167 Ind. 659, 677, 74 N.E. 964, 969 (1905). However, the automatic coverage clause in this case brooked no offense to public policy or unfairness to the Guzoreks. On the contrary, it proposed an entirely reasonable bargain: the Guzoreks would receive immediate coverage on the LeSabre in exchange for notification within a reasonable time of the acquisition (here thirty days) and, if necessary, compensation for the adjusted risk. This is entirely consistent with the objective of covering an additional car (for the benefit of all drivers)

as soon as it is acquired. Coverage merely hinged on some action by the insured within thirty days to trigger its retroactive effect. We hold that the "automatic" coverage clause in this case was not triggered because of Dorothy's failure to notify Colonial Penn during the grace period that the LeSabre had been acquired.

### B. *The "replacement" car provision*

■ The Guzoreks advance an alternative basis for finding coverage of the LeSabre. Dorothy Guzorek's policy allowed her to replace a listed car with a different car during the policy period:

> *You* may replace a *listed auto* with another *private passenger auto,* during the policy period. If *You* do, *We*'ll automatically consider the replacement to be listed. The coverages *You* bought for your former *auto* will apply to the replacement. . . . *We*'ll adjust your premium as described below, under "Premium Adjustment." (Italics in original.)

The policy does not define "replace" or "replacement" nor what Dorothy had to do to effect the change. The Guzoreks contend that the LeSabre was covered as a replacement vehicle on the day of the accident because Dorothy intended to replace the Skylark with the LeSabre when her policy came up for renewal a week after the accident. We disagree. Under any reasonable definition, the LeSabre was not a replacement vehicle.

■ "Replace" broadly means "to take the place of" or "to provide a substitute." WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH 1138 (3d ed. 1988). In this context, read most favorably to the Guzoreks "replace" could have meant (1) a substitution of ownership (the Skylark was sold); (2) a substitution of coverages (the Skylark was no longer covered because it was taken off the policy); or (3) a substitution of customary use (the Skylark was no longer used because it was in storage or was no longer operable). *See id.* ("replace implies a taking the place of someone or something that is now lost, gone, destroyed, worn out, etc.") (emphasis deleted). Although the record indicates Dorothy tried to sell the Skylark after she acquired

the LeSabre, the Skylark had not been sold as of the date of the accident. *Cf. West Am. Ins. Co. v. Mid–American Fire & Cas. Co.,* 611 N.E.2d 646 (Ind.Ct.App.1993) (new car was covered as a replacement vehicle because the car it replaced had recently been sold and the insured intended to keep coverage on same number of vehicles). Dorothy never contacted Colonial Penn to substitute the LeSabre for the Skylark on her policy. Donald drove the Skylark as well as the LeSabre on the day of the accident. Thus, in no sense was the Skylark replaced by the LeSabre. Indeed, there was no time limitation for advising Colonial Penn of a replacement comparable to the thirty-day provision for additions. If a replacement could be found on these facts, an insured could get free coverage indefinitely and retroactively add a new car to the policy when an accident occurs. *See Nationwide Mut. Ins. Co. v. Fleming,* 257 F.Supp. 261, 266 (D.S.C.1966) ("Is it reasonable for an insured to assume that he can transfer coverage from his all purpose truck to a saloon car and retain and operate the truck for another four weeks or so? The court does not think so and the cases do not indicate that the contract can be stretched so far."), *aff'd,* 383 F.2d 145 (4th Cir.1967). Even assuming Dorothy's later expressed intentions are relevant, *State Sec. Ins. Co. v. Ottinger,* 487 N.E.2d 446, 449 (Ind.Ct.App.1985), her actions do not support the conclusion that a replacement had occurred as of October 20, 1992. Indeed, the record reveals that she did not intend to effect the change until her policy came up for renewal on October 27, 1992, and that she did not believe the LeSabre was covered until she "sent the premium" or "called."

Some jurisdictions have established multi-part tests for determining whether a car is a "replacement" vehicle under an automobile insurance policy. *See, e.g., United Farm Bureau Mut. Ins. Co. v. Elder,* 86 Ill.2d 339, 56 Ill.Dec. 47, 49, 427 N.E.2d 127, 129 (1981). A closer case might require examination of some of these nuances, but this case does not present a close question. The legal effect of the undisputed facts is clear: because the Skylark was retained by the Guzoreks, was still in use, and was still listed on the policy at the time of the accident, the LeSabre

cannot be considered a replacement for the Skylark. In sum, the LeSabre was not covered as an "additional" or "replacement" vehicle. Colonial Penn's motion for summary judgment with respect to those issues should have been granted.

## II. Was Donald Guzorek a Covered Driver?

There is a second and independent ground for concluding that no coverage exists in this case. Colonial Penn argues that Dorothy Guzorek's insurance policy was void "ab initio" [4] because she did not reveal at the time she applied for the insurance that Donald lived with her, had a suspended license, and drove nonetheless on a fairly regular basis. Colonial Penn maintains that, under its underwriting guidelines, it would not have insured Dorothy or Donald had this information been disclosed on the application. The Guzoreks respond that Colonial Penn was never misled and that, in any event, Colonial Penn was on inquiry notice before the accident that Donald was driving Dorothy's cars. Illinois Farmers advances similar contentions in arguing that Donald was covered at the time of the accident. As explained below, we agree with Colonial Penn that Donald was not covered due to Dorothy Guzorek's material misrepresentations at the time of issuance.

### A. *Effect of compulsory financial responsibility statutes*

■ As a preliminary matter, we address whether an insurer's common law right to void insurance coverage due to material misrepresentations (discussed in Part II.B *infra*) survived the enactment of laws requiring all Indiana drivers to carry liability insurance or other proof of financial responsibility. Before 1983, the Financial Responsibility Act required liability insurance only after the first accident. IND.CODE § 9–2–1–4 (Supp. 1977). As a result of amendments in 1982 and 1984, *see* 1982 Ind.Acts. P.L. 83, § 1;

1984 Ind. Acts, P.L. 71, § 1, all drivers in this state are now required to carry minimum levels of liability insurance irrespective of their driving record. IND.CODE §§ 9–25–4–1 to –11 (1993 & Supp.1994).[5] Court of Appeals decisions have differed as to the effect of this change on the right to rescind coverage. *American Underwriters Group, Inc. v. Williamson,* 496 N.E.2d 807 (Ind.Ct. App.1986) expressly overruled one of the principal cases establishing this right in Indiana, *Automobile Underwriters, Inc. v. Stover,* 148 Ind.App. 555, 268 N.E.2d 114 (1971). *Williamson* reasoned that allowing the liability insurer to void coverage due to material misrepresentations conflicted with the revamped statute's policy "that persons who suffer loss due to the tragedy of automobile accidents shall have a source and means of recovery." *Williamson,* 496 N.E.2d at 810.

Nine years later, *Motorists Mut. Ins. Co. v. Morris,* 654 N.E.2d 861 (Ind.Ct.App.1995) revived the right to rescind in part, concluding that the liability insurer could rescind the policy in that case because the accident victims had been compensated through their own uninsured motorist coverage. Distinguishing *Williamson, Morris* reasoned that because the policy underlying the Financial Responsibility Act was satisfied where uninsured motorist coverage was in place, total rescission was permissible. The Court of Appeals recently reiterated the *Morris* view in *Federal Kemper Ins. Co. v. Brown,* 674 N.E.2d 1030 (Ind.Ct.App.1997), *trans. denied.*

A federal court applying Indiana law in a diversity case observed that the holdings of *Williamson* and *Morris* appeared to conflict. *Pekin Ins. Co. v. Super,* 912 F.Supp. 409 (S.D.Ind.1995). Concluding that this Court would not follow either *Williamson* or *Morris, Super* held that the third party's uninsured motorist coverage was irrelevant to determining the scope of the liability insur-

---

4. As the Court of Appeals observed, "rescind ab initio" is literally redundant because "[t]o rescind means to void the contract from its inception." *American Underwriters Group, Inc. v. Williamson,* 496 N.E.2d 807, 808 n. 1 (Ind.Ct.App. 1986). ·

5. In 1991, the provisions dealing with liability insurance were recodified and moved without substantive change in the financial responsibility scheme. *See* 1991 Ind. Acts. P.L. 2, § 13. Until 1991, the Financial Responsibility Act was called the Motor Vehicle Financial Responsibility and Driver Improvement Act.

er's right to avoid coverage, but that the liability insurer could rescind only above the minimum levels prescribed by the Financial Responsibility Act. The *Super* court reasoned that shifting liability to the uninsured motorist carrier would disregard "Indiana's public policy ... that auto accident victims' primary means of recovery be from liability insurance." *Id.* at 412 (citation omitted). *Super* thus parted company with *Morris* on allocation of the loss up to the statutory minimums when the third party victim has uninsured motorist coverage. In sum, *Stover* permitted rescission based on material misrepresentations, *Williamson* held that voiding coverage is never permissible in light of changes in the Act, *Morris* held that the insurer could void coverage so long as the third party victim had uninsured motorist protection, and *Super* attempted a compromise by allowing the insurer to deny coverage only above the minimum liability amounts specified by the Act.

Even if we agree with *Morris* that the purpose underlying the Financial Responsibility Act is to provide a source of minimum compensation for accident victims, that goal is satisfied here because the third parties in this case had uninsured motorist coverage. To this extent, but only to this extent, we agree with the analysis of this issue in *Morris* and *Brown.* Conversely, *Williamson* is disapproved to the extent it holds that the liability insurer can never rescind due to material misrepresentations. We leave for another day whether a liability insurer can deny coverage when the third party does not have protection against uninsured motorists. This issue is not settled under current precedent but is neither presented under these facts nor argued by the parties.

Finally, we disagree with *Super*'s conclusion that the defrauded liability insurer should bear the loss even where the third party victim has uninsured motorist coverage. Although the Financial Responsibility Act reflects a strong preference for recovery through liability insurance, this is not the only means of compensation for accident victims. Automobile insurers in this state are required to offer uninsured motorist coverage in recognition of the fact that some peo-

ple will drive without liability insurance in disregard of the law. IND.CODE § 27–7–5–2 (1993 & Supp.1994). Thus, a third party's right to recover through liability insurance is not absolute. *Cf. Transamerica Ins. Co. v. Henry,* 563 N.E.2d 1265, 1268 (Ind.1990) (concluding that the Financial Responsibility Act "does not constitute a social policy to guarantee compensation to all victims of motor vehicle accidents"). There is no injustice in placing the loss with the third party's insurer (here Illinois Farmers), who has presumably been compensated through its premiums for accepting the risk of an uninsured tortfeasor. The accident victims (Pocius and Van Winkle) gain no unfair benefit because they paid for the very coverage at issue.

The sum of this is that Colonial Penn's right to deny coverage due to material misrepresentations, discussed below, is not affected under these facts by the Financial Responsibility Act or the Uninsured Motorists Coverage Act.

### B. *Effect of material misrepresentations in the application*

■ The right to void coverage due to fraud in the making of the policy is well established in the common law. In the insurance context, this protects the insurer's right to know the full extent of the risk it undertakes when an insurance policy is issued. Accordingly, a material misrepresentation or omission of fact in an insurance application, relied on by the insurer in issuing the policy, renders the coverage voidable at the insurance company's option. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Price,* 181 Ind.App. 258, 260, 396 N.E.2d 134, 136 (1979) (collecting cases). Some decisions have described this as a failure of the "meeting of the minds" as to the terms of the contract, specifically the risk to be insured. *Stockberger v. Meridian Mut. Ins. Co.,* 182 Ind.App. 566, 577, 395 N.E.2d 1272, 1279 (1979).

■ Under one definition, a misrepresentation or omission is "material" if knowledge of the truth would have caused the insurer to refuse the risk or to charge a higher premium for accepting the risk. *Brunnemer v. Metropolitan Life Ins. Co.,* 213 Ind. 650, 658, 14 N.E.2d 97, 100 (1938); *Mutual Benefit*

*Life Ins. Co. v. Miller,* 39 Ind. 475, 486 (1872). This inquiry focuses on whether the representation was false and material to the decision to issue the policy. Whether the applicant intended to mislead or knew of the falsity is irrelevant: "False representations, concerning a material fact, which mislead, will avoid an insurance contract, like any other contract, regardless of whether the misrepresentation was innocently made or made with a fraudulent design." *Metropolitan Life Ins. Co. v. Becraft,* 213 Ind. 378, 384, 12 N.E.2d 952, 954 (1938) (citation omitted); *accord Automobile Underwriters, Inc. v. Stover,* 148 Ind.App. 555, 268 N.E.2d 114 (1971), *overruled on other grounds by American Underwriters Group, Inc. v. Williamson,* 496 N.E.2d 807 (Ind.Ct.App.1986). A second approach to materiality in a case, such as this, where rescission is attempted after a loss has been incurred, would measure the materiality not against the underwriting decision, but rather against the loss. In other words, coverage of the incurred loss would be voided if the misrepresentation affected that risk, but not all coverage would necessarily be voided. Under either view, the materiality of the representation or omission is a question of fact to be resolved by the factfinder unless the evidence is such that there can be no reasonable difference of opinion. *Prudential Ins. Co. of Am. v. Winans,* 263 Ind. 111, 115, 325 N.E.2d 204, 206 (1975).

■ The crucial misrepresentation in this case occurred when Dorothy failed to list Donald as a "customary operator" on the "personalized quotation/enrollment form" even though he drove several times per week to his job. Colonial Penn contends, and the Guzoreks do not appear to dispute, that its underwriting guidelines at that time prohibited writing policies for applicants, or members of their household, who had a suspended or revoked license within the prior five years. Equally important, Dorothy did not disclose that Donald even existed. By leaving his name off the application, Dorothy was able to avoid giving follow-up information about Donald's driving record that would have affected Colonial Penn's decision to issue the policy.[6]

Colonial Penn argues that the undisputed facts show that had Dorothy been completely forthcoming on the application in 1990, the policy would not have been issued.[7] Accordingly, Colonial Penn contends it is entitled to rescind the policy and owes no insurance obligations arising out of the October 20, 1992 accident. Whether or not the policy was totally rescindable on these facts, we hold that Donald is not covered. Under the first view of materiality, Colonial Penn could rescind the policy even if Dorothy had been the driver, because Colonial Penn claims it would not have written a policy for her due to Donald's presence in the household. We accept Colonial Penn's assertion of its underwriting guidelines. Under the second view, Dorothy would still receive the coverage that would have issued had the facts represented in the application and relied on by the insurer actually been true. Stated another way,

---

**6.** Arguably Dorothy also misstated the facts when she failed to disclose Donald on the "rate request rush form" as a licensed driver in the household. However, because Donald's license was suspended at the time Dorothy applied for the insurance, a factfinder could conclude that he was not "licensed" within the meaning of the question asked and, accordingly, there was no falsehood. This slender evidentiary reed, standing alone, would not support summary judgment for Colonial Penn because factual disputes at this stage must be construed in favor of the nonmovant. Colonial Penn asserts that Dorothy also failed to disclose that Donald was required to file a "Form SR22" with the State, which requires certain drivers to show proof of financial responsibility. Although the application did ask Dorothy whether any operator of her cars had ever been required to comply with this requirement, Colonial Penn offers no proof that this obligation applied to Donald at the time Dorothy submitted her application.

**7.** The record is unclear on the exact point at which a contract was formed between Dorothy and Colonial Penn. There are at least two possibilities: (1) the "personalized quotation/enrollment form" was an offer that Dorothy accepted when she returned the form with a premium payment; (2) Dorothy's returning the form with a check to initiate coverage was an offer that Colonial Penn accepted when it cashed the check. In any event, all the parties appear to assume that the "personalized quotation/enrollment form" was part of the application and that Dorothy had a duty to answer the questions on the form completely and truthfully, and that Colonial Penn was relying on that information in entering into the policy.

the insurer would retain those risks it knew it was accepting based on the information in the application, and if Dorothy rather than Donald were the operator coverage would be found. Under either view, Donald is not covered because his existence as a spouse and his driving record are clearly material to the loss actually incurred. However, the parties do not address and we do not decide whether the law would permit complete rescission of the policy or only reformation to conform to the facts represented in the application.

### C. The duties of the insurer and inquiry notice

■■■■ The Guzoreks and Illinois Farmers argue that this is not the end of the inquiry. They assert that any right to void coverage of Donald is waived because Colonial Penn was allegedly on inquiry notice before the accident that Donald had a suspended license and was driving Dorothy's cars. We first note that there is no claim that Colonial Penn knew or should have known about Donald at the time of the original application. Although there is little Indiana precedent on the point, the general rule appears to be that the insurer may rely on representations of fact in the application without investigating their truthfulness, unless there is some reason to believe the representations are false. *Price*, 181 Ind.App. at 260–61, 396 N.E.2d at 137; LEE R. RUSS & THOMAS F. SEGALLA, 6 COUCH ON INSURANCE 3D § 82:17 (1996) (collecting cases). Therefore, Colonial Penn had no duty to look beneath the surface of Dorothy's representations to determine whether she had shaded the truth or left out any material information in her application in 1990.

■■■■ However, an insurer cannot avoid coverage where it had knowledge of the facts notwithstanding the material misrepresenta-

tions, or where a reasonable person would have investigated further and the investigation would have uncovered the truth. *Johnson v. Payne*, 549 N.E.2d 48, 51–52 (Ind.Ct. App.1990) (citing *Price* and other cases dealing with inquiry notice). Thus, when the insurer had sufficient information to place it on inquiry notice of possible falsity, whatever facts a reasonably diligent investigation would have discovered are imputed to the insurer. *Id.* For example, the insurer's independent knowledge of the spouse's driving record has been held to waive the right to avoid coverage. *American Family Mut. Ins. Co. v. Kivela*, 408 N.E.2d 805 (Ind.Ct.App. 1980). The Guzoreks and Illinois Farmers maintain that Colonial Penn was placed on inquiry notice that Donald was driving Dorothy's cars by a telephone survey conducted almost a year after Dorothy first obtained her policy. On February 7, 1991, National Reporting Systems, Inc. conducted telephone interviews with Colonial Penn's insureds residing in Indiana to ask them questions about their driving habits. The results of the interview with Dorothy were memorialized on a survey form. The interview disclosed that Donald had "no dr. lic.," which presumably meant "no driver's license," and that Donald was nonetheless driving one of Dorothy's cars 6000–7000 miles per year. The affidavit of Colonial Penn's underwriting manager states that National Reporting Systems is a "separate corporation" from Colonial Penn. The record is otherwise silent on the relationship between Colonial Penn and National Reporting Systems. Nor is it clear whether the survey was used for underwriting or renewal purposes or for some other reason.[8]

■■■■ The inquiry notice rule contains an "exception within the exception" that is dispositive here. Even assuming the telephone survey was conducted for underwrit-

**8.** The survey form was dated "2/7" without any indication as to the year. The year 1991 is established from the affidavit of Jackie Baker, Colonial Penn's underwriting manager, in which she stated that the survey took place in February 1991. The Guzoreks suggest the survey was actually taken in February 1990, nearly three months before Dorothy's policy was issued, and that the survey was part of Dorothy's initial application for insurance. If this were true, today's

analysis and result might be quite different. However, the Guzoreks point to no evidence that contradicts the Baker affidavit, and their mere assertion that a genuine factual dispute exists on this point does not create one. In addition, the Guzoreks' construction makes little sense: it is difficult to imagine how a survey about an existing policy (the survey form contained the policy number) could have been taken before the policy was even issued.

ing purposes, the facts at most show that Colonial Penn was negligent in not connecting the inconsistency between the survey and Dorothy's initial application. It is well settled that an act of negligence will not trump an intentional wrong. *See, e.g., Rushville Nat'l Bank v. State Life Ins. Co.*, 210 Ind. 492, 1 N.E.2d 445 (1936). A person who seeks to interpose the carelessness of another as a defense must come with clean hands. *Whitesell v. Strickler*, 167 Ind. 602, 78 N.E. 845 (1906). Accordingly, even where the insurer is on inquiry notice, as may have occurred in this case, the "requirement of reasonable prudence is not carried to the extent that the law will ignore an intentional fraud." *Price*, 181 Ind.App. at 261, 396 N.E.2d at 137 (citations omitted); LEE R. RUSS & THOMAS F. SEGALLA, 6 COUCH ON INSURANCE 3D § 82:21 (1996) (collecting cases holding that fraud voids the contract even where the insurer or its agents knew of the falsity). Intentional fraud occurs when there is "a material misrepresentation of past or existing fact made with knowledge of or reckless disregard for the falsity of the statement, and the misrepresentation [is] relied upon to the detriment of the relying party." *Adoptive Parents of M.L.V. v. Wilkens*, 598 N.E.2d 1054, 1058 (Ind.1992) (citation omitted); *accord Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind.1996).

■ In this case, there is no factual dispute that the information was withheld intentionally and for the reason that Dorothy knew its disclosure would result in no coverage. Dorothy's misrepresentation was in the nature of an omission, but because the omission was the product of intentional concealment this makes no difference: "Where one has a duty to disclose, concealment implies deceit, and the procurement of a contract through the concealment of facts which one is in duty bound to disclose, amounts to fraud." *Rushville Nat'l Bank*, 210 Ind. at 505, 1 N.E.2d at 450. Dorothy stated that she did not disclose Donald on the application because his license was suspended and he was not supposed to be driving. While this may have been true, by her own admission Dorothy knew that Donald drove her cars to his job at the time she applied for the insurance. Dorothy perhaps believed that her omission was immaterial because she was obtaining coverage only for herself. However, where a claim was asserted based on an accident with Donald driving, the result, from Colonial Penn's point of view, is the same as if coverage was fraudulently sought in the original application, and the analysis is the same. Construed most favorably to the Guzoreks, the undisputed facts show that Dorothy intentionally misled Colonial Penn as to whether Donald was a regular driver. Because Colonial Penn relied on Dorothy's failure to list Donald as a "customary operator" to its detriment, the omission amounted to intentional fraud. Consequently, even assuming for sake of argument that Colonial Penn was on inquiry notice of the falsity, Colonial Penn's right to deny coverage of Donald has not been waived.

### Conclusion

This cause is remanded with instructions to grant Colonial Penn's motion for summary judgment and to deny the Guzoreks' motion for summary judgment, and for further proceedings consistent with this opinion.[9]

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

---

**9.** Due to the resolution of the other issues in this appeal, the question whether Colonial Penn was prejudiced by the delay in learning of the accident is now moot, and we voice no opinion on it.