### The LOVOLD COMPANY,
### Appellant–Plaintiff,

v.

### GALYAN'S BROWNSBURG, INC., Galyan's Family Market, Inc., and P & P Brownsburg Realty, Inc., Appellees–Defendants.

No. 32A04–0105–CV–226.

Court of Appeals of Indiana.

March 5, 2002.

---

James E. Ayers, Wernle, Ristine & Ayers, Crawfordsville, IN, Attorney for Appellant.

Peter J. Rusthoven, Howard E. Kochell, E. Sean Griggs, Barnes & Thornburg, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAKER, Judge.

Once again, we are called upon to examine a party's potential liability for remedial "clean-up" costs under the Indiana Underground Storage Tank Act[1] (the Act). In this instance, the Lovold Company (Lovold) appeals the trial court's grant of summary judgment in favor of Galyan's Brownsburg, Inc., (GBI), Galyan's Family

---

1. IND. CODE §§ 13–23–1–1 to –15. The Act was formerly codified at IND. CODE §§ 13–7– 20–12 to –42.

Market, Inc. (Family Market) (collectively, Galyan's) and P & P Realty, Inc. (P & P). Specifically, Lovold contends it was error to determine as a matter of law that the defendant corporations that had been voluntarily dissolved by the Indiana Secretary of State (Secretary of State), could not be held liable for clean-up costs pursuant to the Act. In essence, Lovold urges that the two-year statute of limitations should not preclude the claims brought against Galyan's because those claims were not known and could not have reasonably been discovered within the limitations period.

### FACTS [2]

In 1963, GBI acquired a certain tract of real estate located at 800 East Main Street in Brownsburg (the site). From the mid 1950s to the early 1980s, the site housed a gasoline station. GBI had leased the premises to the Almond Oil Company (Almond), which was an independent distributor of petroleum products produced by Shell Oil. Almond had installed Shell-brand signs and gasoline dispensing pumps, which were connected to a number of Underground Storage Tanks (USTs). During a ten-year lease, either Almond or an independent sublessee operated a filling station at the site that included the use and operation of USTs.

When Almond ceased filling station operations at the site in 1980, it pumped out nearly all of the gasoline that remained in the USTs and removed the dispensing pumps that had been installed. The nature of the property was changed and the building on the site was used for other purposes including a film developing shop.

In 1983, GBI was liquidated and voluntarily dissolved. GBI published a "Notice

of Voluntary Dissolution" in the newspaper and the Secretary of State ultimately issued a "Certificate of Dissolution" on November 2, 1983. As part of the liquidation, GBI sold and conveyed the site by a general warranty deed to Family Market in return for $397,060. The Notice of Dissolution stated that the business then conducted by GBI would continue unchanged under the name of "Galyan's Family Market, Inc." Appellant's App. at 182.

In 1984, Family Market experienced substantial financial loss, ceased business and was liquidated. The liquidation proceeds were placed in trust for the benefit of Family Market's creditors. Those funds were eventually exhausted, resulting in no undistributed assets of Family Market after the creditors were paid. Moreover, there were no liquidating dividends or other distributions to Family Market shareholders. During the course of the liquidation, Family Market sold and conveyed the site in November 1984 by general warranty deed to P & P, a corporation formed that year, in return for P & P's notes payable to Family Market creditors. P & P never operated a gasoline station on the site. A year later, P & P sold the site to Lovold and then ceased doing business. No undistributed assets remained after paying its creditors, and no liquidating dividends or other distributions were made to its shareholders. Proceeds of the 1985 sale to Lovold were used to pay the P & P notes previously issued to Family Market creditors. In 1987, Family Market and P & P were administratively dissolved by the Secretary of State.

In 1995, the Brownsburg Fire Department discovered that petroleum was leaking from the USTs at the site and submit-

---

2. Many of the facts set forth herein were originally reported in two companion cases: *Shell Oil Co. v. Meyer,* 705 N.E.2d 962 (Ind. 1998) and *Shell Oil Co. v. The Lovold Co.,* 705 N.E.2d 981 (Ind.1998).

ted a report to the Indiana Department of Environmental Management. Within a few months Lovold, the current property owner, removed the tanks and contaminated soil and performed other cleanup work on the property at a cost of $150,000. There is no evidence demonstrating that GBI knew of any UST leakage when it owned the site, either before or after UST use and operation ceased and the pumps were removed. Similarly, neither Family Market nor P & P were aware of any leakage.

On December 20, 1995, Lovold filed a complaint against Galyans pursuant to the Act, seeking to recover its cleanup cost from Shell and other defendants. Lovold demanded contribution from those defendants as a result of the leakage on the site.

GBI filed a motion for summary judgment disclaiming any liability for remedial costs because it had been granted a certificate of voluntary dissolution by the Secretary of State in 1983. Thus, GBI urged that Lovold's action against it could not proceed because it failed to institute that cause of action within two years after the dissolution had occurred. P & P, along with Family Market, alleged entitlement to summary judgment because they were not statutory "owners" or "operators" of the UST's at the time of the release.

In February 2001, Family Market and P & P filed a second motion for summary judgment. They asserted that no genuine issue of material fact existed in light of the administrative dissolutions that were entered by the Secretary of State. Both Family Market and P & P argued that the dissolution of the corporations in 1987, occurring while the corporations were insolvent, and allegedly without any final distribution of assets to their shareholders, established a defense to Lovold's claims for contribution.

On May 8, 2001, the trial court granted the motions for summary judgment and entered final judgment for Galyan's and P & P. Lovold now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

■ On appeal the standard of review of a summary judgment motion is the same standard used in the trial court: summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Shell Oil Co. v. The Lovold Co.*, 705 N.E.2d 981, 983–84 (Ind.1998). All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. *Colonial Penn. Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind.1997). The moving party bears the burden of proving the absence of a genuine issue of material fact. *Shell Oil Co.*, 705 N.E.2d at 984. If the movant sustains this burden, the opponent must set forth specific facts showing that there is a genuine issue of material fact. *Id.*

### II. Lovold's Claims

#### A. Cause of Action Against GBI

■ Lovold argues that the trial court erred in granting GBI's motion for summary judgment because the voluntary corporate dissolution of GBI does not, as a matter of law, operate to bar potential liability for environmental contamination that had not been discovered within two years after the dissolution. In essence, Lovold urges that a voluntarily dissolved corporation still may face environmental liability even though the action against it was not brought within two years following the dissolution.

In addressing this issue, we note the relevant provisions of our corporation dissolution statute, I.C. § 23–1–45–7 [3]:

> (c) If the dissolved corporation publishes a newspaper notice in accordance with subsection (b),[4] the claim of each of the following claimants is barred *unless the claimant commences a proceeding to enforce the claim within two (2) years after the publication date of the newspaper notice . . . .*
>
> (d) A claim may be enforced under this section:
>
> (1) against the dissolved corporation, to the extent of its undistributed assets; or
>
> (2) if the assets have been distributed in liquidation, against a shareholder of the dissolved corporation to the extent of the shareholder's pro rata share of the claim or the corporate assets distributed to the shareholder in liquidation, whichever is less, but a shareholder's total liability for all claims under this section may not exceed the total amount of assets distributed to the shareholder.

(Emphasis supplied).

In determining whether Lovold's action against GBI is time-barred, we note in *Indiana Nat'l Bank v. Churchman*, 564 N.E.2d 340 (Ind.Ct.App.1990), the bank brought an action against the sole shareholder of a corporation that had been dissolved over two years earlier in an effort to collect the balance due on an unpaid promissory note. On appeal, the bank argued that the trial court's entry of summary judgment against it was improper because the circumstances dictated that the theory of equitable estoppel tolled the two-year statute of limitations or "survival" period embodied in the statute. *Id.* at

342. We rejected this argument and observed that:

> The question of whether the theory of equitable estoppel operates to toll I.C. 23–1–7–1(e) has not been addressed by an Indiana court. However, we have the benefit of numerous decisions from other jurisdictions. Without fail, these decisions treat statutes identical, or similar, to I.C. 23–1–7–1 as "survival" statutes, rather than as statutes of limitation. That is, the statute gives life to a right otherwise destroyed.
>
> At common law, the corporate capacity to sue or be sued terminated when the corporation dissolved. [Citation omitted]. Similarly, dissolution destroyed the capacity of former shareholders to sue or be sued with respect to rights entirely dependent upon and existing solely as an outgrowth of shareholder status. Thus a survival statute operates to give life to a claim that would otherwise be extinguished by virtue of a corporate dissolution.
>
> We see no reason for rejecting the view taken by these cases. It is "[a] firmly established premise that a dissolved corporation may thereafter be proceeded against either criminally or civilly only if authorized by the laws of the state of its incorporation." *Therefore, suit is barred if filed, as here, over two years from the date of dissolution.*

*Id.* at 342–43 (alteration in original and citation omitted) (quoting *U.S. v. P.F. Collier & Son Corp.* (7th Cir.1953) 208 F.2d 936, 937). We further commented that:

> Enactment of a survival statute indicates a legislative policy to place a definite termination upon corporate existence with respect to dissolution, as well

---

**3.** This statute was previously codified as I.C. § 23–1–7–1(e).

**4.** Whether the corporation adequately complied with the requirements of a newspaper notice is not at issue here.

as to protect shareholders, officers, and directors of dissolved corporations from prolonged and uncertain liability. *The relief corridor afforded to claimants for a limited period thereafter is narrow indeed and should not be liberally extended or enlarged.* Courts interpreting such enactments give deference to this policy and have refused to apply equitable remedies to defeat survival statutes. *Id.* at 344 (emphasis supplied). Here, the application of the rationale espoused in *Churchman* works as an absolute bar to Lovold's 1995 action that was filed over twelve years following GBI's voluntary dissolution.[5]

Nonetheless, Lovold urges that liability should not be avoided merely because a corporation is formally dissolved in light of the "overriding public policies of encouraging and requiring environmental clean-up." Appellant's brief at 10. Again, we point out that our legislature has seen fit to carve out a window of vulnerability for two years in the event that a corporation is dissolved. Such a rule is in line with the policy to place a definite termination upon a corporation's existence in order to shield officers and owners of the corporation from uncertain or unlimited liability. *See id.*

Moreover, while not controlling here, we deem it appropriate to discuss the Seventh Circuit Court of Appeals decision in *Citi-zens Elec. Corp. v. Bituminous Fire & Marine Ins. Co.*, 68 F.3d 1016 (7th Cir. 1995). In *Citizens Electric,* an action was brought against a dissolved corporation for cleanup costs in an area that had become contaminated with PCBs. The action was commenced in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).[6] The provisions contained in our Underground Storage Tank legislation follow the same remedial principles established in CERCLA. *W. Ohio Pizza v. Clark Oil & Ref.,* 704 N.E.2d 1086, 1090 (Ind.Ct.App. 1999). The *Citizens Electric* court determined, in essence, that a CERCLA action may not be brought against a dissolved corporation after the expiration of the state survival period. *Id.* at 1020. Nothing embodied in CERCLA served to "override" this rule and the *Citizens Electric* court further observed that if the state survival statute were ignored, the common law rule is that "all litigation by or against a dissolved corporation must be dismissed." *Id.* at 1019. Such an observation is precisely in line with our decision in *Churchman* as well as the purpose and effect of the survival statute.[7] Accordingly, we see nothing in the Act that would counter the narrow limitations set forth in the survival statute.

We also note that in an effort to avoid the dictates of *Churchman* to the corpo-

---

**5.** Although not at issue here because of our discussion of the applicability of the "survival statute," we note that our supreme court has determined that a corporate officer may be held personally liable for violating the Indiana Environmental Management Act (the Act), whether or not the traditional doctrine of piercing the corporate veil would produce such liability. *IDEM v. RLG, Inc.,* 755 N.E.2d 556, 558 (Ind.2001). Specifically, the court in *RLG* observed that the sole corporate officer was an active participant in various activities that amounted to a violation of the Act. *Id.* at 563.

**6.** 42 U.S.C. § 9607.

**7.** The seventh circuit is not alone in rejecting CERCLA preemption of state survival statutes. *See Louisiana–Pacific Corp. v. ASARCO, Inc.,* 5 F.3d 431, 433–34 (9th Cir.1993); *cf. Aluminum Co. of Am. v. Beazer E., Inc.,* 124 F.3d 551, 567 (3d Cir.1997). We have found no federal appellate decision to the contrary and Lovold acknowledges that a "line of cases" rejects its position. Appellant's brief at 12.

rate dissolution provisions, Lovold likens the circumstances here to those involving medical malpractice claims for latent injuries. It is apparent that Lovold ignores that part of *Churchman* where we declared that the "relief corridor" is narrow and will not be liberally extended or enlarged. Additionally, unlike certain "latent" medical conditions, the presence of USTs and possible leakage could have been ascertained had Lovold made inquiry and performed some investigation.

■ In general, absent fiduciary disclosure duties, a buyer who complains of matters that could have been discovered before purchase will not be protected. *Stucco Cotton Duster Co. v. Comet Elec. Co.*, 95 Ind.App. 672, 680, 180 N.E. 185, 187–88 (1932) (recognizing no liability when information is as accessible to one party as to the other and the truth may be ascertained by the exercise of reasonable diligence), *trans. denied; see also Choung v. Iemma*, 708 N.E.2d 7, 14 (Ind.Ct.App. 1999) (holding no liability for not disclosing that a house had been relocated and placed upon a newly constructed foundation; advertisement stating that the house was a "rebuilt walkout ranch" put the buyer on notice, requiring him to make further inquiry of the seller or to obtain an inspection of the premises).

Here, any prospective buyer was placed on notice of the likely presence of USTs at the site. An examination of the chain of title records would have disclosed a number of recorded leases made to various oil companies. Lovold could have made such an inquiry and arranged an inspection or investigation for possible leakage. The designated evidence shows that it failed to do so and it did not obtain seller representations, warranties or other assurances on that topic. Thus, Lovold's inaction and failure to take any steps in an effort to learn readily ascertainable information

about the site wholly undermines its analogy to latent injuries or other medical malpractice limitations notions. Thus, the trial court properly entered summary judgment in GBI's favor.

### B. Family Market and P & P

■ Lovold argues that the trial court erred in granting summary judgment for Family Market and P & P. In essence, Lovold urges that the corporate dissolution of Family Market and P & P and their liquidation of the assets to creditors should not have affected their liability for remedial cleanup.

In resolving this contention, we first set forth some general policies and protections afforded under the Act. The Act provides for the regulation of USTs and the prevention and remediation of pollution from tanks. *Shell Oil Co.*, 705 N.E.2d at 967. Further, it gives IDEM the authority to promulgate rules to enforce its provisions, including the ability to require "owners and operators" of USTs to take corrective action. I.C. § 13–23–1–2, 13–1. There is a provision for the recovery of corrective action costs and attorneys fees by a private party who successfully prosecutes a claim against an owner or operator of those tanks. I.C. § 13–23–13–8. The Act anticipates payment of costs by owners and operators before or after cleanup. *Id.* Specifically, I.C. § 13–23–13–8(b) provides that:

> A person who . . .
>
> (2) undertakes corrective action resulting from a release from an underground storage tank, regardless of whether the corrective action is undertaken voluntarily or under an order issued under this chapter,
>
> is entitled to receive a contribution from a person who *owned or operated* the underground storage tank at the time the release occurred.

**288**

Turning to some definitional statutes, I.C. § 13–11–2–150(a) defines "owner" as:

(a) "Owner" for purposes of Ind.Code 13–23, except as provided in subsection (b),[8] means:

(2) for an underground storage tank that is:

(A) in use before November 8, 1984; but

(B) no longer in use on November 8, 1984;

a person who owned the tank immediately before the discontinuation of the tank's use.

To qualify as an "operator" of a UST, a person must be "in control of, or hav[e the] responsibility for, the daily operation of an underground storage tank." I.C. § 13–11–2–148.

We note that Lovold has not challenged the contention that Family Market and P & P did not qualify as "operators" of the USTs. Moreover, the undisputed facts show that that there had been no "daily operation" of the USTs for years before either corporation came into existence or owned the site. In *Shell Oil Co. v. Meyer,* our supreme court determined that "daily operation" requires "continuous" operation activity:

The definition of "operator" includes the phrase "daily operation of the underground storage tank." Although the Act does not require interaction with the tank literally each day, "daily" implies at least some continuous level of activity as opposed to installation, repair or removal of a storage tank, or performance of some other irregular or infrequent activity with respect to it. From the beginning of the time span relevant to this case the "daily operations" i.e., the activities routinely associated with the use of

the tank, included filling it, dispensing gasoline from it and measuring its contents.... [M]easurement was accomplished by periodic "sticking" i.e., placing a dipstick like pole in the tank to determine the level of fluid.

705 N.E.2d at 972–73.

No "daily operations" occurred after the site ceased operating as a gas station in 1980.

Additionally, it is apparent under the Act that neither Family Market nor P & P were ever "owners" for USTA purposes. Specifically, neither corporation owned any of the USTs "immediately before the discontinuation of the tank's use" in accordance with I.C. § 13–11–2–150(a). Again, the undisputed evidence reveals that discontinuation of use occurred in 1980, before either of these corporations was formed or acquired the site. Inasmuch as neither Family Market nor P & P qualified as "owners" or "operators" of the USTs in accordance with the statutory definitions, neither of them is subject to any contribution claim liability under the Act. Thus, the trial court did not err in granting summary judgment in their favor.

*CONCLUSION*

In light of the disposition of the issues set forth above, we conclude that the trial court properly entered summary judgment for GBI because Lovold's cause of action against that corporation was precluded by the two-year statute of limitations or "survival" provision set forth in the corporate dissolution statute. We also note that the trial court properly entered summary judgment for Family Market and P & P because neither corporation qualified as an

---

**8.** This subsection excepts from the "owner" definition security interest holders who do not participate in managing a tank or produce, refine or market regulated substances.

"owner" or "operator" within the meaning of the Act.

Affirmed.

NAJAM, J., and MATTINGLY–MAY, J., concur.