**EDGEWORTH–LASKEY PROPER-TIES, L.L.C., E–L Allison Pointe I, LLP, E–L Allison Point II, LLP, and E–L Allison Pointe III, LLP, Individually and on Behalf of All Similarly Situated Members of Allison Pointe Owners Association, Inc., Appellants–Plaintiffs,**

v.

**NEW BOSTON ALLISON LIMITED PARTNERSHIP, Appellee–Defendant.**

No. 49A02–0210–CV–889.

Court of Appeals of Indiana.

Aug. 18, 2003.

Rory O'Bryan, Thaddeus R. Ailes, Harrison & Moberly, LLP, Carmel, IN, Attorneys for Appellants.

Cathy Elliott, V. Samuel Laurin III, Bose McKinney & Evans, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellants Edgeworth–Laskey Properties, L.L.C., E–L Allison Pointe I, LLP, E–L Allison Pointe II, LLP, and E–L Allison Pointe III, LLP, individually and on behalf of all similarly-situated members of Allison Pointe Owners Association, Inc., (collectively referred to as, "E–L Owners") plaintiffs below, present this interlocutory appeal of the trial court's partial grant of summary judgment in favor of appellee-defendant New Boston Allison Limited Partnership ("New Boston").[1] We affirm.

### Issue

E–L Owners raise two issues on appeal, which we consolidate and restate as whether the trial court properly granted partial summary judgment to New Boston on Counts I and II of E–L Owners' complaint.

### Facts and Procedural History

#### I.  Background

In 1986, SMT Realty Ltd. ("SMT"), an Indiana limited partnership, owned approximately fifty-seven acres of land on the northeast side of Indianapolis, which later became known as Allison Pointe Business Park ("Allison Pointe").  SMT wanted to develop Allison Pointe into a "mixed use business park."  (Appellee's App. at 64.)  When SMT began to develop Allison Pointe, SMT established the Declaration of Development Standards, Cove-

---

1.  E–L Owners also filed a Request for Oral Argument, which we hereby deny.

nants, and Restrictions for Allison Pointe ("Declaration"), which ran with the real estate and inured to the benefit of, and consequently became binding upon, the owners. Pursuant to the Declaration, SMT was the initial Developer of Allison Pointe. Indeed, the Declaration defines "Developer" as "SMT Realty Ltd. or any successor in interest or assign which is expressly designated as a successor Developer in a recorded instrument executed by the preceding Developer." (Appellant's App. at 4.) As the Developer, SMT had various rights and powers, including the right to appoint three of the five directors to the Association Board of Directors ("Association Board"), and to appoint all five members of the Development Advisory Board ("Advisory Board"), until such time that the undeveloped acreage at Allison Pointe is less than 10% of the remaining real estate, excluding the acreage at Allison Lake.[2]

William N. Carlstedt ("Carlstedt") was involved in the development of Allison Pointe. In 1986, Carlstedt was the assistant manager of SMT's general partner, M–T Associates, and Carlstedt signed SMT's limited partnership agreement on behalf of M–T Associates. When M–T Associates changed its name to Citimark Land Partnership No. 1 ("Citimark I"), Carlstedt was the general manager of Citimark I. In October of 1988, SMT changed its name to Allison Pointe Realty, L.P. ("APR") and Carlstedt signed and recorded the Third Amended and Restated Certificate of Partnership, which confirmed the name change. Carlstedt also signed and recorded the Second Amendment to the Declaration, which formally changed the Developer's name from SMT to APR.

In addition, Carlstedt signed numerous deeds on behalf of APR when parcels of Allison Pointe were sold or conveyed. On November 6, 1992, Allison Pointe Owners Association, Inc. ("Association") was formed, and Carlstedt was one of the original directors of the Association.

## II. May 1995 Transactions—Sale of Allison Pointe to New Boston

On May 4, 1995, APR conveyed four Parcels of land located in Allison Pointe to Citimark I. As a result of this transaction, APR owned no remaining property in Allison Pointe. Also on May 4, 1995, Citimark I conveyed the same four Parcels of land to New Boston. Thus, New Boston became the owner of most of the real estate in Allison Pointe, with the exception of parcels that had previously been sold or transferred to Klefstad Companies, Inc., Shoney's, Inc., and the Association. As part of this transaction, Citimark I, the sole remaining partner of APR, became a limited partner of New Boston.

In his affidavit, which was properly designated to the trial court, Carlstedt attested that it was APR's, New Boston's, and Citimark I's intent and understanding that New Boston would become APR's successor-in-interest. As such, New Boston would become the Developer of Allison Pointe under the Declaration. However, the parties did not prepare and record a written document to that effect, as required by the Declaration.

## III. The Assignment

On April 4, 1996, APR expired pursuant to its limited partnership terms. When APR dissolved, Carlstedt, on behalf of Citimark I, i.e., the sole remaining partner of APR, was responsible for winding up

---

**2.** As of the date of this appeal, the undeveloped acreage at Allison Pointe is more than 10% of the remaining real estate.

APR's affairs and disposing of any remaining partnership property or assets. On June 16, 1996, Carlstedt executed a document entitled "Assignment," with Citimark I as Assignor and New Boston as Assignee, which assigned all of APR's rights, responsibilities, and obligations as Developer of Allison Pointe to New Boston. On July 5, 1996, the Assignment was recorded in Marion County. In the upper right-hand corner of the Assignment, there is a cross-reference to the recorded instrument numbers for the original Declaration and the first and second amendments. E–L Owners purchased their first parcel of land in Allison Pointe on July 24, 1997.

### IV. Declaration Requires Owners to Obtain Approval of Plans for Development

The Declaration contains detailed procedures that owners of Allison Pointe properties must follow to obtain the Advisory Board's approval of plans for development of a site. In part, owners are required to:

> (a) ... submit to the [Advisory Board] a description of the proposed use of the Parcel, three (3) copies of preliminary renderings of elevations, a preliminary grading plan and a plot plan.

(Appellant's App. at 680.) Thirty days after receiving the requisite plans, the Advisory Board shall approve or disapprove of the plans and shall give reasons for any disapproval. The Declaration further provides that:

> (b) After obtaining the Initial Approval of the [Advisory Board,] the Owner shall submit to the [Advisory Board] no later than the date upon which its plans for the Parcel are submitted to the Appropriate Zoning Authority for its approval, a site plan and a stamped set of final plans and specifications (the "Site Development Plan") which shall include the following:

> . . .

> Within thirty (30) days after receipt of the Site Development Plan, the [Advisory Board] shall either give its written approval thereof signed by the chairman of the [Advisory Board] ("Final Approval") or give written disapproval specifically stating the reasons for such disapproval.

> (c) Final Approval by the [Advisory Board] will be based on the acceptability of the Site Development Plan with respect to all factors which, in the sole opinion of the [Advisory Board,] affect the desirability or suitability of the proposed construction or alteration.

(Appellant's App. at 680–81.)

During Carlstedt's tenure on the Advisory Board, the Advisory Board has reviewed plans and specifications submitted by all owners at Allison Pointe in the process of developing their parcels, including submissions by E–L Owners. During that time, the Advisory Board has approved plans for nine office buildings, three of which were owned by E–L Owners.

### V. E–L Owners Plans for the W–4 Site

The fourth parcel of land that E–L Owners purchased from New Boston is known as the W–4 Site. One of the documents executed with the W–4 Site is the Second Amendment to Real Estate Purchase and Sale Agreement ("W–4 Site Purchase Agreement" or "Agreement"). New Boston and E–L Owners are the only parties to the Agreement. Exhibit B to the W–4 Site Purchase Agreement provides that:

> [E–L Owners] and [New Boston] acknowledge and agree that [E–L Owners] will, in due course, pursue receipt of all applicable Park approvals (as defined in the Agreement) as necessary under the

Declaration, including but not limited to [Advisory] Board Approvals under Article V of the Declaration. In this regard, [New Boston] agrees to:

   (i) cause the [Advisory] Board to respond within five (5) business days with written notice of approval or disapproval, accompanied by specific detailed objections to (a) [E–L Owners] submission for Initial Approval (as defined in the Declaration), (b) any resubmission by [E–L Owners] for Initial Approval or Final Approval (as defined in the Declaration), following any nonapproval by the [Advisory] Board, and failure of the [Advisory] Board to respond within said period shall be deemed to constitute the applicable Park Approval;

   . . .

   (iii) cause the [Advisory] Board to act reasonably and consistently with (a) existing buildings in Allison Pointe, (b) the Park Standards, and (c) any and all of the [Advisory] Board's prior actions taken, objections specified, changes requested and statements made to [E–L Owners] in connection with the Park Approvals for the W–4 Parcel, . . . rather than in the [Advisory] Board's sole discretion as otherwise permitted under the Declaration.

(Appellant's App. at 244.)

On May 15, 2000, E–L Owners submitted their initial plan to the Advisory Board, however it did not include a preliminary grading plan. On June 9, 2000, because of E–L Owners' non-compliance with the Declaration, the Advisory Board rejected E–L Owners' submission.

### VI. E–L Owners' lawsuit against New Boston

On June 11, 2001, E–L Owners filed a Complaint against New Boston, which it later amended. In Count I of the Amended Complaint, as a derivative action, E–L Owners sought a declaration that New Boston is not the Developer of Allison Pointe. In Count II, E–L Owners sought a declaration that the Advisory Board is bound by the terms of an amendment to the W–4 Site Purchase Agreement between E–L Owners and New Boston, and that the plans they submitted to the Advisory Board for the development of the W–4 Site are deemed approved.

On November 6, 2001, E–L Owners filed a Motion for Summary Judgment regarding Count I of the Amended Complaint. Subsequently, New Boston filed a Cross-Motion for Summary Judgment with respect to Counts I and II of the Amended Complaint. While the summary judgment motions were pending, E–L Owners requested leave to file a Second Amended Complaint, which added Count III against the Association. The Second Amended Complaint did not alter Counts I and II, and Count III was not part of the summary judgment motions below and is not part of this interlocutory appeal.

On May 2, 2002, the trial court conducted a hearing, in part, on the motion and cross-motion for summary judgment. On May 16, 2002, the trial court denied E–L Owners' Motion for Summary Judgment, however, this denial is not part of the present appeal.

On August 5, 2002, the trial court granted New Boston's Cross-Motion for Summary Judgment, regarding Counts I and II of E–L Owners' Amended Complaint. It is from this order that E–L Owners now appeal.

### Discussion and Decision
#### I. Summary Judgment Standard of Review

On review of a trial court's decision to grant or deny summary judgment, we ap-

ply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. *Carie v. PSI Energy, Inc.,* 715 N.E.2d 853, 855 (Ind.1999). Once the moving party has sustained its initial burden of proving the absence of a genuine issue of material fact and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts establishing a genuine issue for trial. *Stephenson v. Ledbetter,* 596 N.E.2d 1369, 1371 (Ind.1992). We may consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purposes of the motion for summary judgment. Ind. Trial Rule 56(C), (H). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. *Cowe v. Forum Group, Inc.,* 575 N.E.2d 630, 633 (Ind.1991). Although the nonmovant has the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the nonmovant was not improperly denied his or her day in court. *Colonial Penn Ins. Co. v. Guzorek,* 690 N.E.2d 664, 667 (Ind.1997). Specific findings and conclusions by the trial court are not required, and although they offer valuable insight into the rationale for the judgment and facilitate our review, we are not limited to reviewing the trial court's reasons for granting or denying summary judgment. *Bernstein v. Glavin,* 725 N.E.2d 455, 458 (Ind.Ct.App.2000). Rath-

er, a grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Id.*

In addition, "[t]he fact that the parties [made] cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Ind. Farmers Mut. Ins. Group v. Blaskie,* 727 N.E.2d 13, 15 (Ind. Ct.App.2000).

### II. Analysis

E–L Owners argue that the trial court's partial grant of summary judgment to New Boston on Counts I and II of E–L Owners' Amended Complaint was erroneous because New Boston is not the Developer of Allison Pointe and, thus, is not entitled to any rights and obligations given to the Developer in the Declaration. E–L Owners further contend that the partial grant was erroneous because the Advisory Board is bound by the terms of the W–4 Site Purchase Agreement and, in particular, exhibit B. We address each of these arguments separately.

### A. New Boston's Status as Developer

First, E–L Owners contend that the trial court erroneously granted New Boston's Motion for Summary Judgment on Count I of the Amended Complaint because New Boston is not the Developer of Allison Pointe. E–L Owners maintain that New Boston is not the Developer, as that term is defined in the Declaration, because APR did not assign its rights and obligations as Developer to New Boston.[3]

---

3. E–L Owners also argue that "no amount of constructive or actual notice, implicit or actual knowledge, or *de facto* exercise, of the Developer's rights can take the place of a valid instrument assigning, transferring, con-

veying, or otherwise lawfully conferring the actual corporate or property right or interest upon New Boston." (Appellant's App. at 16.) However, because we find the issue of whether E–L Owners have standing to challenge

As previously mentioned, the Declaration defines Developer as "SMT Realty Ltd. or any successor in interest or assign which is expressly designated as a successor Developer in a recorded instrument executed by the preceding Developer." (Appellant's App. at 4.) In October of 1988, SMT changed its name to APR and that name change was reflected in the Declaration. Thus, pursuant to the Declaration, APR or any successor in interest or assign, expressly designated as such in a recorded instrument, is the Developer.

On May 4, 1995, APR conveyed four Parcels of land to Citimark I, which, in turn, conveyed the four Parcels to New Boston. However, at that time, APR did not expressly designate Citimark I or New Boston as the successor Developer in a recorded instrument. Later, after APR dissolved by its limited partnership terms, Carlstedt, acting on behalf of Citimark I, and New Boston executed the Assignment, which expressly assigned APR's rights and obligations as Developer to New Boston.

E–L Owners argue that the problem with the Assignment, however, is that the Assignor, Citimark I, is not the preceding Developer, as required by the Declaration. Assuming arguendo that E–L Owners are correct in the assertion that the Assignment did not validly transfer APR's rights to New Boston, we still affirm the trial court's grant of summary judgment on this issue because E–L Owners do not have standing to challenge New Boston's status as Developer. The standing doctrine constitutes a significant restraint upon the ability of Indiana courts to act, as it denies courts any jurisdiction absent actual injury to a party participating in the case. *Pence v. State,* 652 N.E.2d 486, 488 (Ind.1995). The standing doctrine is similar to, but not identical with, the real party in interest requirement of Indiana Trial Rule 17. However, they are both "requirements intended to insure that the party before the court has the substantive right to enforce the claim being asserted." *Hosler v. Caterpillar, Inc.,* 710 N.E.2d 193, 197 (Ind.Ct. App.1999). Standing focuses on whether the plaintiff is the proper person to invoke the court's power. *Jones v. Sullivan,* 703 N.E.2d 1102, 1105–1106 (Ind.Ct.App.1998). "Under the traditional private standing doctrine, a party must demonstrate both a personal stake in the outcome of the lawsuit and, at a minimum, that he is in immediate danger of sustaining some direct injury as a result of the conduct at issue." *Hosler,* 710 N.E.2d at 197. Further, in all cases of mistake in written instruments, "courts of equity will interpose their aid between original parties, or those claiming under them in privity, but on behalf of persons not thus connected, courts of chancery do not lend their aid." *East v. Pedin,* 108 Ind. 92, 8 N.E. 722, 724 (Ind.1886).

■ E–L Owners do not have standing to challenge the Assignment in a derivative action because they were not members of the Association at the time that the Assignment was prepared and recorded. Derivative actions must comply with Indiana Trial Rule 23.1[4] and Indiana Code Section

---

New Boston's status as Developer in a derivative action to be dispositive, we do not address this issue.

4. Indiana Trial Rule 23.1 provides, in part:

In a derivative action brought by one or more shareholders or members or holders of an interest in such shares or membership, legal or equitable, to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege that the plaintiff was a shareholder or member or holder of an interest, legal or equitable, in such shares or membership at the time of the transaction or any part thereof of which

23–1–32–1.[5] As a consequence, to maintain a derivative action, a shareholder or member of an association must satisfy the following four requirements: (1) the complaint must be verified; (2) the plaintiff must have been a shareholder or member at the time of the transaction of which he or she complains; (3) the complaint must describe the efforts made by the plaintiff to obtain the requested action from the board of directors; and (4) the plaintiff must fairly and adequately represent the interests of the shareholders or members. *See Riggin v. Rea Riggin & Sons, Inc.,* 738 N.E.2d 292, 306 (Ind.Ct.App.2000).

In the present case, E–L Owners are not entitled to bring a derivative action on behalf of the Association regarding Count I of the Amended Complaint because they were not members of the Association at the time that the Assignment was executed and recorded. Accordingly, without analyzing the other three requirements, we hold that E–L Owners do not satisfy the second requirement necessary to maintain a derivative action and, thus, the trial court properly granted New Boston's Motion for Summary Judgment on Count I of the Amended Complaint.

### B. The W–4 Site Purchase Agreement

■ E–L Owners next argue that the trial court erroneously granted New Boston's Motion for Summary Judgment on Count II of the Amended Complaint because New Boston breached the purchase agreement for the W–4 Site. The designated evidence reveals that when E–L Owners purchased from New Boston the W–4 Site, the parties executed the W–4 Site Purchase Agreement. Exhibit B to the Agreement provides that:

[E–L Owners] and [New Boston] acknowledge and agree that [E–L Owners] will, in due course, pursue receipt of all applicable Park approvals (as defined in the Agreement) as necessary under the Declaration, including but not limited to [Advisory] Board Approvals under Article V of the Declaration. In this regard, [New Boston] agrees to:

(ii) cause the [Advisory] Board to respond within five (5) business days with written notice of approval or disapproval, accompanied by specific detailed objections to (a) [E–L Owners] submission for Initial Approval (as defined in the Declaration), (b) any resubmission by [E–L Owners] for Initial Approval or Final Approval (as defined in the Declaration), following

he complains or that his share or membership thereafter devolved on him by operation of law, and the complaint shall also allege with particularity the efforts, if any, made by the plaintiff, to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or

members in such manner as the court directs.

5. Indiana Code Section 23–1–32–1 provides:

A person may not commence a proceeding in the right of a domestic or foreign corporation unless the person was a shareholder of the corporation when the transaction complained of occurred or unless the person became a shareholder through transfer by operation of law from one who was a shareholder at that time. The derivative proceeding may not be maintained if it appears that the person commencing the proceeding does not fairly and adequately represent the interests of the shareholders in enforcing the right of the corporation.

any nonapproval by the [Advisory] Board, and failure of the [Advisory] Board to respond within said period shall be deemed to constitute the applicable Park Approval;

. . .

(iii) cause the [Advisory] Board to act reasonably and consistently with (a) existing buildings in Allison Pointe, (b) the Park Standards, and (c) any and all of the [Advisory] Board's prior actions taken, objections specified, changes requested and statements made to [E–L Owners] in connection with the Park Approvals for the W–4 Parcel, . . . rather than in the [Advisory] Board's sole discretion as otherwise permitted under the Declaration.

(Appellant's App. at 244.)

Subsequently, on May 15, 2000, E–L Owners submitted their initial plans to the Advisory Board, however the plans did not include a preliminary grading plan, as required by the Declaration. On June 9, 2000, nineteen business days later, because of E–L Owners' non-compliance with the Declaration, the Advisory Board rejected E–L Owners' submission.

In response, E–L Owners filed Count II of the Amended Complaint. Paragraph 32 of Count II alleges that New Boston "breached the covenant made in Exhibit B by continually refusing to . . . acknowledge that the W–4 Plans have been approved and refusing to allow [E–L Owners] to proceed with its intended development of Site W–4." (Appellant's App. at 955–56.) However, the relief that E–L Owners seek is a declaratory judgment that the plans, which were submitted to, and rejected by, the Advisory Board, were deemed approved on May 22, 2000, i.e., five business days after their submission.

E–L Owners argue that the trial court erroneously granted New Boston's Motion for Summary Judgment because the Advisory Board is bound by the terms of the W–4 Site Purchase Agreement and E–L Owners are entitled to relief. Resolution of this issue requires us to interpret the W–4 Site Purchase Agreement. When interpreting a written contract, our goal is to ascertain the intent of the parties at the time of execution, as revealed by the language they chose in expressing their rights and responsibilities. *Anderson v. Horizon Homes, Inc.,* 644 N.E.2d 1281, 1290 (Ind. Ct.App.1995). Where the terms of a contract are unambiguous, the meaning of the contract is determined as a matter of law. *Id.* Thus, our standard of review for the interpretation of an unambiguous contract is de novo. *Abbey Villas Dev. Corp. v. Site Contractors, Inc.,* 716 N.E.2d 91, 100 (Ind. Ct.App.1999).

On the other hand, when the meaning of the contract cannot be gleaned from the four corners of the instrument, the intention of the parties becomes a question of fact, and we resort to extrinsic evidence. *Anderson,* 644 N.E.2d at 1290. Under that scenario, our review of a trial court's findings is deferential. *Id.* The test for determining if a contract is ambiguous is whether reasonable persons would find the agreement subject to more than one interpretation. *Id.*

Here, the W–4 Site Purchase Agreement is not facially ambiguous. Rather, by its terms, it requires New Boston to make the Advisory Board approve or disapprove of any development plans submitted by E–L Owners within five business days. If the Advisory Board does not so expeditiously act, the submissions are deemed approved according to the terms of the Agreement. The Agreement further requires New Boston to compel the Advisory Board to abandon its discretion under the Declaration and act reasonably and consistently with reference to the existing buildings in Allison Pointe, Park

Standards, and the Advisory Board's previous actions and statements made to E–L Owners in connection with the W–4 Parcel. Accordingly, there may be a genuine issue of material fact as to whether New Boston breached the W–4 Site Purchase Agreement, and as to whether New Boston is liable to E–L Owners for that breach, when the Advisory Board did not act as specified in the Agreement.

However, Count II of the Amended Complaint does not seek relief directly from New Boston for its breach of contract. Instead, in Count II, E–L Owners pray

> for a judgment to be entered in [their] favor and against [New Boston] and the Association, declaring and adjudging that the preliminary plans submitted by [E–L Owners] to the [Advisory Board] on May 15, 2000 were deemed approved at the close of business on May 22, 2000; and that the [Advisory Board], in considering any submission for Final Approval made by [E–L Owners,] must act consistently with its prior approval of the preliminary plans, and reasonably and consistently with existing buildings in Allison Pointe, and for any other and further relief deemed appropriate by the [trial court.]

(Appellant's App. at 955–56.) The Advisory Board was not party or privy to the contract between New Boston and E–L Owners.[6] The trial court cannot require a non-contracting party to adhere to the contractual terms. *See generally Morris v. McDonald's Corp.*, 650 N.E.2d 1219, 1223 (Ind.Ct.App.1995). Accordingly, the trial court properly granted New Boston's Mo-

tion for Summary Judgment on Count II of the Amended Complaint.

For the foregoing reasons, we affirm the trial court's partial grant of Summary Judgment to New Boston on Counts I and II of the Amended Complaint.

Affirmed.

BROOK, C.J., and NAJAM, J., concur.

---

6. It is irrelevant to our analysis that New Boston, as Developer, appointed all five members of the Advisory Board because those appointments alone do not suggest that New Boston has the authority to require the Advisory Board to approve or disapprove of certain submissions within a specified period of time. Indeed, if that were the case, there would be no need for the establishment of the Advisory Board.